```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF RHODE ISLAND
```

```
_____
                                   )
UNITED STATES OF AMERICA           )
                                   )
    v.                             )    Cr. No. 24-49 WES
                                   )
TROY LOVETTE ANTLEY,               )
                                   )
         Defendant.                )
_____)
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, Senior District Judge.

Before the Court is Defendant Troy Antley's Motion to Suppress Fruits of Unlawfully Prolonged Traffic Stop and Memorandum in Support ("Mot. Suppress"), ECF No. 13. For the reasons below, the Motion to Suppress is denied.

## I.   BACKGROUND

On Saturday night, March 30, 2024, Patrolman Nathaniel Colicci of the Providence Police Department was on routine patrol near Trinity Square on the South Side of Providence, Rhode Island. Hr'g Tr. 10:14-24; Mot. Suppress Ex. A ("Police Rep."), at 2, ECF No. 13-1. Based on his professional experience, Colicci understood this section of Providence to be a high-crime area. Hr'g Tr. 10:4-13; Gov't's Opp'n Def.'s Mot. Suppress ("Opp'n Mot. Suppress") 3, ECF No. 20. Shortly before 9:00 PM, Colicci was driving his marked police cruiser north on Broad Street when he noticed a Blue Chevrolet Silverado idling in front of Fernandez Square Liquors,

which sits a few car lengths south of a potential righthand turn onto Portland Street. Hr'g Tr. 12:20-13:10; Police Rep. 2; Opp'n Mot. Suppress Ex. 4, ECF No. 20-4. The windows of the pickup truck were rolled all the way down and its driver, Antley, "was sitting in a relaxed position, leaning to his left against the driver's door." Police Rep. 2; Hr'g Tr. 13:11-22. Colicci activated the overhead floodlights of his police cruiser as he passed the truck to get a better view of its passenger compartment and saw Antley "quickly sit up in his seat, snap his head to the left," and look in Colicci's direction "with wide eyes." Police Rep. 2; Hr'g Tr. 13:11-22.

Colicci took the next left, into a parking lot, and watched Antley's truck from across the street. Hr'g Tr. 13:23-14:11. Less than a minute passed before Antley started driving; as Colicci turned back onto Broad Street to follow him, Antley made an abrupt righthand turn onto Portland Street without using his turn signal. Police Rep. 2; Hr'g Tr. 14:13-20. By the time Colicci got onto Portland Street, Antley had "gained a significant amount of distance," only to quickly stop in the middle of the lane and — with a passenger, Harry Jackson — get out of the truck and begin walking away. Police Rep. 2; see also Mot. Suppress Ex. B, Bodyworn Camera Footage, Patrolman Nathaniel Colicci ("Bodycam"), Mar. 30, 2024, ECF No. 13-2. Antley had stopped in front of a

fenced-off construction site, the truck's lights were on, and music was playing from the radio. Bodycam, at 00:32.

Colicci drove down Portland Street for about fifteen seconds before activating his emergency lights. Id. at 00:15. Another five to ten seconds passed before he came to a stop in front of Antley's truck and turned on his body-worn camera.[1] Id. at 00:28. When Colicci got out of his police cruiser, Antley was standing in front of the driver-side door of his truck, and Jackson was standing on the passenger side. Id. Colicci approached Antley, who proceeded toward the back of the truck, and told him that he had stopped Antley for not using his turn signal. Id. at 00:36. Colicci then asked Antley for his ID; whether he had any weapons on him; and if he would consent to a pat-down, "just 'cause you hopped out of the car." Id. at 00:45. Antley gave Colicci his ID, said that he had no weapons, and consented to the pat-down, which yielded only a pack of cigarettes. Id. As Colicci was patting Antley down, he asked him again, "What'd you hop out of the car for? Why'd you get out of the car?" Id. at 01:02. Antley responded that it was because he saw Colicci turn on his emergency lights. Id. at 01:06.

---

[1] The video recorder of the body-worn camera "automatically preserves 30 seconds of video footage preceding engagement." Gov't's Opp'n Def.'s Mot. Suppress ("Opp'n Mot. Suppress") 2 n.1, ECF No. 20.

About one minute and fifteen seconds passed between Colicci leaving his police cruiser and finishing the pat-down. Id. at 01:42. He then turned to Jackson, who had since walked to the back of the truck, and asked for his ID. Id. As that happened, Antley said "alright, thank you," and walked back toward the cab of his truck. Id. "Just stay right here, man," Colicci said, pointing to the back of the truck, "could you stand right there?" Id. at 01:47, 01:54. About fifteen seconds passed before Antley took another step toward the cab, pointed, and said, "You want me to turn that shit down?" Id. at 02:08. (The music was still playing.) "No, you can stand right there," Colicci said. Id. After Jackson gave Colicci his ID, Colicci told Jackson to "go talk to him," referring to another officer, off-camera, who had since arrived on the scene; "let me talk to you," Colicci then said, referring to Antley. Id. at 02:15; see also Def.'s Mot. Introduce Evid. Additional Bodyworn Camera Video Supp. Mot. Suppress ("Mot. Introduce") 2, ECF No. 25 (describing bodycam footage of Patrolman Matthew Corlone). At this point, almost two minutes had passed since Colicci got out of his police cruiser. Bodycam, at 02:20.

Colicci spoke with Antley for another twenty seconds before asking him again about why he and Jackson got out of the truck.[2]

| | |
|---|---|
| 02:45 | Colicci: How come you guys hopped out of the car when I pulled you over? Why'd you guys get out? |
| 02:51 | Antley: Because . . . the lights. |
| 02:53 | Colicci: So, you got out of the car? |
| 02:54 | Antley: Yeah. |
| 02:55 | Colicci: (Sigh) That's really not — there's no — there's nothing illegal in the car? |
| 03:00 | Antley: No. |
| 03:02 | Colicci: No? Is it your car? |
| 03:03 | Antley: Yeah, yeah. I pay the insurance. (He says, fumbling with his cigarettes.) |
| 03:07 | Colicci: Nothing illegal in there though? |
| 03:08 | Antley: No. |
| 03:09 | Colicci: No drugs, nothing like that? |
| 03:10 | Antley: Nah. No traffic stops, no stopping at the lights. |
| 03:14 | Colicci: No guns or nothing? |
| 03:15 | Antley: No. |
| 03:16 | Colicci: Okay. It's just kind of odd that you guys hopped out of the car. (Antley nods and says "Oh.") Usually when people do that, |

---

[2] The excerpted transcript is marked with timestamps of the bodycam recording; Patrolman Colicci got out of his police cruiser about thirty-two seconds into the recording.

|       |                                                                                                                                                                                                         |
|-------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|       | they're trying to distance themselves from the car.                                                                                                                                                     |
| 03:21 | Antley: Sorry about that.                                                                                                                                                                               |
| 03:22 | Colicci: If there's something in there that's small, I don't care, as long as you're honest about it. If there's drugs or something in there, I'm not concerned. Alright, can I search it?             |
| 03:27 | Antley: No (shaking his head).                                                                                                                                                                          |
| 03:29 | Colicci: Okay. I am going to Terry frisk[3] it for weapons since you guys got out of the car and walked away like that. So, if there is something in there and you let me know, I can work with you.    |
| 03:39 | Antley: Alright.                                                                                                                                                                                        |
| 03:40 | Colicci: So, is there something in there?                                                                                                                                                               |
| 03:42 | Antley: No.                                                                                                                                                                                             |
| 03:43 | Colicci: Okay, well I am — I am going to check the car for weapons.                                                                                                                                     |
| 03:45 | Antley: No, there's no weapons.                                                                                                                                                                         |

Id. at 02:45-03:45. Antley then turned his back to Colicci and, once again, moved toward the cab of his truck. Id. at 03:45. Colicci then grabbed Antley by the sleeve of his jacket and said,

---

[3] The term "Terry frisk" refers to Terry v. Ohio, 392 U.S. 1 (1968), in which the Supreme Court held that under the Fourth Amendment, a police officer may "stop and frisk" a person whom the officer reasonably suspects to be armed and involved in criminal activity. 392 U.S. at 30-31. The Supreme Court extended Terry to allow protective searches of a vehicle's passenger compartment in Michigan v. Long, 463 U.S. 1032, 1035 (1983).

"Don't go back to the car." Id.  Colicci then guided Antley into the back of his police cruiser.  Id. at 03:50.  By then, about three and a half minutes into the stop, at least two other police vehicles had arrived on the scene.  Id. at 04:06.

After placing Antley in the back of his police cruiser, Colicci approached Jackson, who was still standing with another officer, patted him down, and asked whether any weapons were in the truck.  Id. at 05:25.  Jackson said he knew nothing.  Id. at 05:35.  Colicci then walked toward the cab of the truck, peered through the open window, and saw an unfolded knife in plain view on the driver's seat.  Id. at 06:03.  He then opened the door to get a closer look, turned down the music, and saw the butt of a semiautomatic pistol wedged between the driver's seat and the center console; there was a bullet in the cupholder as well.  Id. at 06:14; Police Rep. 2.  After alerting his fellow officers to what he had found, Colicci walked back to his police cruiser and arrested Antley.  Bodycam, at 06:30, 07:15, 07:40.

About two months after his arrest, Antley was indicted on one count of 18 U.S.C. § 922(g)(1), which makes it unlawful for someone convicted of a felony to possess a firearm.  Indictment 1, ECF No. 1.  After hearing the Motion to Suppress on February 7, 2025, the Court left the record open for several weeks to allow for additional briefing.  Mot. Hr'g (Feb. 7, 2025); Hr'g Tr. 160:23-

161:4.  On February 24, Antley filed the Motion to Introduce, which seeks to introduce additional bodycam footage from other police officers on the scene.  The Government did not object to the Motion but nevertheless filed a Response on February 28.  Gov't's Resp. Mot. Introduce, ECF No. 26.  The Court grants the Motion to Introduce and takes this additional evidence into consideration.

## II. LEGAL STANDARD

The Fourth Amendment guarantees a right against "unreasonable searches and seizures."  U.S. Const. amend. IV.  Because a traffic stop, even for a minor violation like failing to use a turn signal, is a "seizure" under the Fourth Amendment, it must be supported by a reasonable suspicion (if not probable cause) that a violation has occurred.  Heien v. North Carolina, 574 U.S. 54, 60 (2014) (citing Brendlin v. California, 551 U.S. 249, 255-59 (2007)); see also United States v. Potter, 78 F.4th 486, 488 (1st Cir. 2023) (noting case law is unclear "as to whether a stop for a traffic violation must be supported by probable cause or reasonable suspicion").

Separate from the question of whether to initiate a traffic stop is whether a stop has been prolonged to the point of being unreasonable.  See Rodriguez v. United States, 575 U.S. 348 (2015).  "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' — to address the

traffic violation that warranted the stop, . . . and attend to related safety concerns." Id. at 354 (citations omitted) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are — or reasonably should have been — completed." Id. (citing United States v. Sharpe, 470 U.S. 675, 686 (1985)).

"The Government bears the burden of proving a warrantless search or seizure was reasonable under the Fourth Amendment." United States v. Sanders, 248 F. Supp. 3d 339, 344 n.4 (D.R.I. 2017) (citing United States v. Arias, 588 F. Supp. 2d 237, 239 (D.R.I. 2008)); United States v. Serrano-Acevedo, 892 F.3d 454, 457 (1st Cir. 2018) ("On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search." (quoting United States v. Delgado-Pérez, 867 F.3d 244, 250 (1st Cir. 2017))).

## III. DISCUSSION

Antley moves to suppress the pistol on two grounds. First, he argues that Colicci did not have probable cause to pull him over for failing to use a turn signal when he turned onto Portland Street, because Colicci could not have seen the right taillight of Antley's truck from his view in the parking lot across the street. Mot. Suppress 8-12. Second, Antley argues that Colicci unlawfully

9

prolonged the traffic stop beyond its original purpose, i.e., to issue a traffic citation for failure to use a turn signal. Id. 12-20. Relevant to this argument is whether Colicci had reasonable suspicion to conduct a protective search of Antley's truck. Id.

The Court finds that Antley cannot succeed on either ground. Therefore, the Motion to Suppress is denied.

### A. Initial Traffic Stop

To begin, the Court finds the Government has satisfied its burden of showing that Patrolman Colicci had legitimate grounds to initiate the traffic stop, regardless of whether reasonable suspicion or probable cause was required. According to Antley, Colicci could not have seen the right taillight of Antley's truck from his view in the parking lot across the street from the liquor store; therefore, Colicci could not have known whether Antley used his turn signal when he made a right from Broad Street onto Portland Street. Mot. Suppress 8-12.

As the Government notes, this argument presumes that Colicci was positioned directly across from the intersection of Broad Street and Portland Street, such that he could not have seen the right taillight of Antley's truck immediately before he turned. Opp'n Mot. Suppress 14. The argument fails for two reasons. First, the Government shows that Colicci more likely watched Antley from a different section of the parking lot, one that would have

enabled him to see the right taillight of Antley's truck through the entirety of the turn onto Portland Street. Second, even if Colicci was directly across from the intersection, he nevertheless could have seen either the front- or rear-right blinker of Antley's truck for a significant portion of the turn.

On the first issue, Colicci testified that right after he passed Antley's truck, he turned left into the parking lot directly across from the liquor store so that he could "continue to observe the vehicle." Hr'g Tr. 13:6-14:5; see also Police Rep. 2. About half a minute later, when Antley started driving, Colicci "observed the vehicle to operate onto Broad Street and take a right onto Portland [Street] without using a turn signal." Hr'g Tr. 15:12-14; Police Rep. 2. According to an overhead image of the area, there are two ramps in and out of the parking lot from Broad Street: one across from Portland Street, and the other across from the liquor store. Opp'n Mot. Suppress Ex. 4 ("Overhead Image"), ECF No. 20-4. Because Colicci turned left into the parking lot after passing Antley's truck, he likely used the ramp across from Portland Street. This means Colicci would likely have needed to make a three-point, 180-degree turn upon entering the parking lot to have placed himself where Antley suggests, i.e., perpendicular to Broad Street and directly across from Portland Street. Compare Mot. Suppress 9 (image of suggested vantage point), with Overhead

11

Image (showing proximity between ramp and suggested vantage point). The Court finds it far more likely that Colicci, after using the ramp across from Portland Street to enter the parking lot, drove through the lot back toward the liquor store — to get a better view of Antley's truck — and then used the ramp across from the liquor store to exit the parking lot in pursuit of Antley. Based on the overhead image and other photo exhibits shared by the Government, this would have provided Colicci with a full view of Antley's rear taillight as he turned onto Portland Street. See Overhead Image; Opp'n Mot. Suppress Exs. 5-7, ECF Nos. 20-5, 20-6, 20-7.

Second, even if Colicci watched Antley from the section of the parking lot directly across from Portland Street, he likely still would have been able to see whether Antley used his turn signal. Colicci would not have been able to see Antley's rear taillight immediately before he turned. But Colicci would have been able to see the truck's front-right blinker as Antley approached the intersection, and furthermore, Antley's right taillight would have come into view well before he completed the turn. Therefore, unless Antley not only waited until the very last moment to engage his turn signal, but also disengaged the signal before completing the turn onto Portland Street, Colicci would have known whether Antley used his turn signal. And even if

12

Antley used his turn signal as just described, it would have been reasonable for Colicci to suspect — given his vantage — that Antley did not use a turn signal.[4]

In short, the Court finds that Antley was not subjected to an unreasonable seizure in violation of the Fourth Amendment when Colicci pulled him over for failing to use a turn signal.

**B. Protective Search**

Because Patrolman Colicci had legitimate grounds to initiate the traffic stop, the Court must determine whether he unlawfully prolonged the stop and, relatedly, whether he had reasonable suspicion to conduct a protective search of Antley's truck. The Court finds that Colicci did not unlawfully prolong the stop and that he had reasonable suspicion to conduct the protective search.

A police officer cannot extend the duration of a traffic stop to pursue an unrelated investigation that is not supported by reasonable suspicion. Rodriguez, 575 U.S. at 355. That does not mean, however, that during a traffic stop, a police officer must ignore any suspicions that arise and focus solely on addressing the traffic violation that predicated the stop. Rather, when it

---

[4] The Court also notes that because the sun sets well before 9:00 PM in late March, had Antley used his turn signal, "it would have shone brightly in the dark of night." Opp'n Mot. Suppress 13.

13

comes to

> reasonable suspicion in the context of a traffic stop, an inquiring court must ask whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau — the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed.

United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001), (citing United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998)), cert. denied, 534 U.S. 1150 (2002). In other words, "while an officer's actions must bear some relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention." Id. (citing Sowers, 136 F.3d at 27).

Colicci pulled Antley over for failing to use his turn signal. This was a Fourth Amendment seizure, the "mission" of which was "to address the traffic violation that warranted the stop, . . . and attend to related safety concerns." Rodriguez, 575 U.S. at 354 (citing Caballes, 543 U.S. at 407). In typical circumstances, "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop,'" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355 (second alteration in original) (quoting

14

Caballes, 543 U.S. at 408).

Colicci's performance of this mission was complicated by the fact that Antley and Jackson got out of the truck as he approached in his police cruiser. Regardless of the subjective motivation behind Colicci's decision to initiate the traffic stop, it was objectively reasonable for Colicci to probe Antley's rationale for exiting the truck while addressing the traffic violation. See United States v. Guerrero, 19 F.4th 547, 549 (1st Cir. 2021) (noting that "the Constitution's reasonableness command [does] not depend[] on the officer's 'actual motivations' — and that is because the Fourth Amendment generally prefers 'objective' inquiries over 'subjective' ones" (quoting Whren v. United States, 5517 U.S. 806, 812-14 (1996))).

After Colicci got out of his police cruiser, the first thing he did was inform Antley of the reason for the stop and ask for his ID. Bodycam, at 00:45. Because he found it suspicious, based on his professional experience, that Antley and Jackson got out of the truck, Colicci next asked Antley whether he had any weapons on him, whether he would consent to a pat-down, and why he got out of the truck. Id. In part because the stop occurred on a Saturday night, on a quiet street, in a high-crime area, all three questions were reasonable. Rodriguez, 575 U.S. at 356 (recognizing "the government's 'legitimate and weighty' interest in officer safety

15

and noting that "[t]raffic stops are especially fraught with danger to police officers" (first quoting Pennsylvania v. Mimms, 434 U.S. 106, 110-11 (1977) (per curiam); and then quoting Arizona v. Johnson, 555 U.S. 323, 330 (2009))); see also Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (noting whether the stop occurred in a high-crime area is "among the relevant contextual considerations in a Terry analysis" (citing Adams v. Williams, 407 U.S. 143, 144, 147-48 (1972))).

Antley's response to Colicci's third question — that he got out of his truck because he saw Colicci's lights — would not have quelled Colicci's suspicions so much as raise them further, because the two men got out of the truck before Colicci activated his lights but after Colicci had turned onto Portland Street.[5]  Hr'g Tr. 15:22-17:21.  Then, in the span of about twenty seconds, Antley twice moved toward the cab of his truck, despite Colicci asking him not to move after the first time.  Bodycam, at 01:42.

At this point, given the totality of the circumstances, it would have been reasonable for Colicci to suspect that Antley's

---

[5] Bodycam footage of the stop shows a car pull away from the scene as Colicci approaches Antley's truck on foot. Mot. Suppress Ex. B, Bodyworn Camera Footage, Patrolman Nathaniel Colicci ("Bodycam") 00:32, Mar. 30, 2024, ECF No. 13-2.  It is possible that Antley and Jackson got out of the truck to greet the occupants of that vehicle.  If that is what happened, Antley had two chances to explain as much to Colicci, but he did not.

truck contained weapons or some other contraband.  See Samson v. California, 547 U.S. 843, 848 (2006) (noting that courts "'examine the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment" (brackets omitted) (quoting United States v. Knights, 534 U.S. 112, 118 (2001))).  But instead of immediately conducting a protective search of the truck, Colicci reasonably engaged Antley in further questioning, ostensibly to either narrow the inquiry to the subject of weapons or dispel his suspicions altogether.  After this line of questioning, and after Antley made a third attempt to get back into the cab of the truck, Colicci's suspicion that weapons were inside the truck became even more reasonable.

Although Colicci had reasonable suspicion to believe there were weapons inside Antley's truck, the question remains whether Colicci was justified under the circumstances to conduct the protective search.  At this point in the stop, several other officers had arrived on the scene; not only that, but after Antley went back to the truck a third time, Colicci escorted him to the back of his police cruiser.  But Antley was not under arrest, and for Colicci to complete the traffic stop, he would have needed to permit Antley's reentry into the truck, whether to retrieve his registration and proof of insurance, or just to be on his way after receiving a ticket.  In either scenario, Antley would "have [had]

17

access to any weapons inside" the truck, thereby creating a risk to officer safety. Michigan v. Long, 463 U.S. 1032, 1052 (1983). Based on the circumstances, it was objectively reasonable for Colicci to believe that there was indeed a risk to his and others' safety. Id. at 1049-50. And despite the presence of backup, Colicci was justified in taking steps to eliminate that risk by conducting a protective search of Antley's truck. See Guerrero, 19 F.4th at 550, 560-61 (holding protective search of vehicle was reasonable where suspect was handcuffed in a police cruiser).

Accordingly, the Court finds that Colicci did not unlawfully prolong the stop and that he had reasonable suspicion to conduct the protective search of the passenger compartment of Antley's truck. Because this all occurred in the context of a lawfully predicated traffic stop, Colicci's subsequent discovery of the pistol did not stem from a violation of Antley's Fourth Amendment rights.

## IV. CONCLUSION

For the foregoing reasons, Defendant Troy Antley's Motion to Suppress Fruits of Unlawfully Prolonged Traffic Stop and Memorandum in Support, ECF No. 13, is DENIED.

IT IS SO ORDERED.

/s/ William E. Smith
_____
William E. Smith
Senior District Judge
Date: April 16, 2025